UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| LATONYA CANNON,<br><br>   Plaintiff,<br><br> v.<br><br>AMERICAN CYANAMID CO., et al.,<br><br>   Defendants. | Case No. 11-CV-0055-LA |
| TYANN McHENRY,<br><br>   Plaintiff,<br><br> v.<br><br>AMERICAN CYANAMID CO., et al.,<br><br>   Defendants. | Case No. 11-CV-0055-LA |
| D'ANGELO THOMPSON,<br><br>   Plaintiff,<br><br> v.<br><br>AMERICAN CYANAMID CO., et al.,<br><br>   Defendants. | Case No. 11-CV-0055-LA |
| DIJONAE TRAMMELL,<br><br>   Plaintiff,<br><br> v.<br><br>AMERICAN CYANAMID CO., et al.,<br><br>   Defendants. | Case No. 14-CV-1423-LA |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE THE EXPERT OPINION TESTIMONY
OF LEANNE PANIZICH, PhD**

# INTRODUCTION

Defendants question whether Plaintiffs' actually read the reports from vocational rehabilitation expert, Leanne Panizich, Ph D. *Nowhere* in those reports does Dr. Panizich opine that because of how Plaintiffs grew up, "they were never going to amount to much anyway." (Dkt. 763, pp. 5, 6.) *Nowhere* in those reports does she treat them as "caricatures" who, by virtue of their circumstances, "cannot perform better than those circumstances." (*Id.,* p. 6.) In fact, Dr. Panizich describes Plaintiffs this way:

**Tyann McHenry** is a first generation college student attending Alcorn State University with a 3.75 freshman GPA. She has exceeded the academic achievements of her family, and her peers at Riverside High School in Milwaukee. She is above average intellectually on testing, and has "no evidence of vocationally relevant limitations in her ability to pursue academic or career goals." (*See generally,* Dkt. 764-2, quoted language on p. 18.)

**Dijonae Trammell** is a 26-year old college graduate with a degree in Accounting from Savannah State University. She is employed full-time as an accountant earning $60,000 per year, while also pursuing a Master of Business Administration at the University of Georgia's Terry College of Business. Like Ms. McHenry, she has outperformed her family and peer group, and her earnings and future vocational performance are "limited" only by "her motivation, personal preferences, choices and career-related decision making." (*See generally,* Dkt. 764-4, quoted language on p. 20.)

**D'Angelo Thompson** is a high-school graduate with some schooling at Milwaukee Area Technical College (MATC). Testing reveals intelligence beyond his historic academic performance and potential for further skill acquisition. His vocational status is consistent with that of his educational peers at Riverside High School in Milwaukee. He is not limited in his probable career path of "semi-skilled occupations including those requiring some course work, technical training, or credentials …" (*See generally,* Dkt. 764-3, quoted language on p. 27.)

**LaTonya Cannon** earned her GED through the adult high school program at MATC, receiving an award as the highest achiever in her class. Testing, both during her schooling and vocational evaluation, revealed average intellectual performance, with the capacity to enhance her learning, and her earning capacity, through additional education at the technical school level. She has generally been employed full-time since completing her education, including at present, where her duties include staff oversight. (*See generally,* Dkt. 764-1.)

Based upon Plaintiffs' historic academic and vocational achievements and their future potential, Dr. Panizich concludes that Plaintiffs do not have a vocational or earning capacity loss due to their alleged lead exposure.

Dr. Panizich reached these conclusions by following the PEEDS-RAPEL methodology for vocational evaluation. This approach is widely accepted and endorsed by scholars, practitioners, and the courts who have considered it. Dr. Panizich properly adhered to the method's five-domains of inquiry, including the gathering of family occupational and educational history, testing, and in-person interviews. Other than the criticisms addressed below, Plaintiffs do not challenge the testing she performed (or her interpretation of the results), the conduct of her interviews, or the accuracy of the data upon which she relied (including information from Milwaukee Public Schools, the Wisconsin Department of Education, and the Georgia Governor's Office). Because Plaintiffs' criticisms are without merit, the motion to exclude Dr. Panizich's testimony must be denied.

## LEGAL STANDARD

When assessing the reliability of expert testimony under Rule 702, a court "must determine whether the expert is qualified in the relevant field and whether the methodology underlying [her] conclusions is reliable." *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 640 (7th Cir. 2003). In determining whether that methodology was correctly applied, courts ask whether the expert employed the kinds of facts or data "on which experts in the field would reasonably rely." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 809 (7th Cir. 2013). The Seventh Circuit has cautioned repeatedly that a court's analysis under this rule "does not ordinarily extend to the reliability of the conclusions [an expert's] methods produce." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("[W]e

emphasize that the court's gatekeeping function focuses on an examination of the expert's methodology.") A district court therefore commits reversible error "if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc.*, 732 F.3d at 806.

## ARGUMENT

### I. THE PEEDS-RAPEL METHODOLOGY USED BY DR. PANIZICH MEETS THE REQUIREMENTS OF RULE 702 AND *DAUBERT*.

The irony of Plaintiffs' argument should not be lost on the Court. Plaintiffs seek to exclude Dr. Panizich's opinions because she followed an established, recognized methodology in the field of vocational rehabilitation. (Dkt. 763, pp. 6-10.) Of course, in *Burton,* the plaintiffs (who are represented by the same counsel as Plaintiffs here) offered the opinions of Timothy Riley, another vocational expert, who followed **no methodology at all**. Nonetheless, even though "[h]e did not apply an established methodology," the Court permitted Mr. Riley to testify because, "the questions posed to him were unusual," he had an "understanding of the various published methodologies," and he gave an "account of his reasoning sufficient for a fact-finder to determine [its] validity." (*Burton* Dkt. 1119, p. 17.) The same "unusual" questions are present in these cases. It would be wrong for the Court to prohibit testimony from a vocational expert who answers those questions by following established methods, when it previously allowed the testimony of one who ignored them.[1]

Plaintiffs' assertion that by following the PEEDS-RAPEL method Dr. Panizich's options are "without merit or scientific foundation" is pure sophistry. (Dkt. 763, p. 10.) Although the method

---

[1] The *Burton* plaintiffs ultimately decided not to call Mr. Riley as a witness at trial. And because Dr. Panizich's testimony in those cases was offered purely as a rebuttal to Mr. Riley's vocational opinions, Defendants could not call her either. Here, Defendants are offering Dr. Panizich's opinions as part of their defense case-in-chief, irrespective of any opposing vocational testimony offered by Plaintiffs.

was first articulated in a peer-reviewed 2005 article by Neulicht and Berens (Dkt. 764-9), its foundational concepts date back to literature in the fields of sociology, economics and forensic rehabilitation from the 1950s. (*See* Panizich Dec., ¶¶3-11.) Since 2005, textbooks,[2] articles,[3] and professional service companies in the vocational rehabilitation field[4] have all endorsed the PEEDS-RAPEL method. Indeed, the dissertation about which Dr. Panizich testified at her deposition and which Plaintiffs' reference in their brief (Dkt. 763, pp. 9-10; *see also* Dkt. 764-13[5]), is now a 2020 peer-reviewed journal article validating the factors used in the PEEDS-RAPEL method. (*See* Panizich Dec., ¶¶17-18, Exhibit F.) Thus, Plaintiffs' claim that there has been no peer-reviewed validation of PEEDS-RAPEL in the past fifteen years (Dkt. 763, pp. 7, 10) is demonstrably false.

Judicial decisions discussing PEEDS-RAPEL acknowledge its "general acceptance" and validity. *See Morgan v. Jacques*, 2010 U.S. Dist. LEXIS 157126 at *8 (D. Vt. Oct. 5, 2010) (describing PEEDS-RAPEL as "'generally accept[ed]' within the 'relevant scientific community'" and a

---

[2] *See e.g.,* Weed R. and Berens D.E. (Eds.), *Life Care Planning and Case Management Handbook* (3rd ed.) CRC Press (2010), Chapters 4 and 22; Riddick-Grisham S. and Deming D.E. (Eds.), *Pediatric Life Care Planning and Case Management* (2nd ed.) CRC Press (2011), Chapter 13, pp. 305-314 (includes case study); Robinson R.H. (Ed.), *Foundations of Forensic Vocational Rehabilitation*, Springer Publishing Co. (2014), Chapter 2, pp. 46-47. Cited chapters are attached to the Panizich Dec. as Exhibits B, C, and D.

[3] *See e.g.,* Neulicht, A.T. and Berens, D.E. (2015), "PEEDS-RAPEL©: A case conceptualization model for evaluating pediatric cases with acquired brain injury," *NeuroRehabilitation,* 36(3), pp. 275–287; Sapp L., Remley T. and Range L. (2020), "The Validity of Exploring Educational Attainment Levels and Occupational Skill and Physical Strength Demand Levels of Caregivers When Evaluating Loss of Earning Capacity in Pediatric Cases," *The Rehabilitation Professional,* 28(1), pp. 5-14. Cited articles are attached to the Panizich Dec. as Exhibits E and F.

[4] *See e.g.,* Vocational Diagnostics Incorporated: Pediatric Case Evaluation (Firm specializes in medical and vocational forensic damages assessment. Their experts use PEEDS-RAPEL in evaluating a child's future ability to work and earn wages.); OAS Occupational Assessment Services, Inc.: Determining lost earnings due to the personal injury or disability of a child (Vocational experts at this firm use the PEEDS-RAPEL methodology to determine the child's future loss of earning capacity.) Stokes & Associates: Pediatric Vocational Assessments (The firm states that "one generally accepted model for assessing pediatric earning capacity is the PEEDS-RAPEL© model (Neulicht & Berens, 2005)." They also reference other sources that support PEEDS-RAPEL.).

[5] Plaintiffs only attached the abstract and conclusion from the Sapp dissertation with their moving papers. A complete copy is attached to the Panizich Dec. as Exhibit G.

"reliable method"); *Sugarman v. Liles,* 172 A.3d 971, 982 (Md. Ct. Spec. App. 2017) (noting PEEDS-RAPEL "is appropriate to use on younger individuals"); *Rochkind v. Stevenson*, 2016 Md. App. LEXIS 340 at *74 (Md. Ct. Spec. App. July 20, 2016), *rev'd on other grounds* (endorsing expert's use of PEEDS-RAPEL which focuses "on parental and family history in assessing the vocational prospects of the child"); *Mackey v. British Columbia,* 2016 BCSC 1333, ¶155, *Canadian Government News*, July 21, 2016 (describing PEEDS-RAPEL as "a well-established methodology" and "well respected as a tool for predicting a young person's career prospects.").

Finally, even if Plaintiffs were correct (and they are not) that PEEDS-RAPEL has not been "established" or "validated" as an accurate predictor of vocational information (Dkt. 763, pp. 7, 10.), that would not be grounds for exclusion under *Daubert.* Legal professionals often forget, *Daubert* was a **plaintiff's** case. The Petitioners, two minor children and their parents, lost below because the lower courts ruled that the opinions of their eight well-credentialed experts who concluded that Bendectin could cause birth defects based on animal studies, chemical structure analyses, and unpublished reanalysis of previously published human statistical studies, did not meet the "general acceptance" criteria under *Frye*. The Supreme Court, in announcing the *Daubert* standard, emphasized that it is unreasonable to require that scientific testimony be "'known' to a certainty." *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 590 (1993). Instead, the Court held that the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Here, the well-accepted and often-used principles and methodology of PEEDS-RAPEL easily clear the *Daubert* hurdle. Dr. Panizich's reliance on this approach cannot be grounds for the exclusion of her testimony.

## II. DR. PANIZICH'S OPINIONS ON VOCATIONAL LOSS AND EARNING CAPACITY ARE RELEVANT.

Plaintiffs contend that because they supposedly have "not sought to introduce evidence of loss of earnings," Dr. Panizich's opinions "will not be of any use, whatsoever, to the jury." (Dkt. 763, p. 4.) This is untrue, and the *Burton* trial proves it.

Even though Plaintiffs' chose not to have Mr. Riley testify in *Burton*, they nonetheless presented ample evidence and argument about vocational loss and earning capacity. For example, Plaintiffs' neuropsychologist, Dr. Idit Trope, who has no training or expertise in vocational issues, testified about the "opportunities and choices" that were supposedly foreclosed because of the brain damage and lost IQ points Messrs. Burton, Owens and Sifuentes allegedly sustained due to their elevated blood lead levels. (Benson Dec., Exhibit A, pp. 3050-52.) She showed the jury slides depicting open doors, and closed doors due to "brain damage." (*Id.,* Exhibit B, pp. 17-18.)

As was made clear during trial, "opportunities and choices" was Plaintiffs' code for educational attainment and, in turn, vocational success. The following trial excerpts demonstrate this:

- During the direct examination of plaintiffs' expert Dr. Bruce Lanphear, he explained how lost IQ "has a big impact on how children will do across their entire life. About the income they'll have. ***For every IQ [point] lost, there's a reduction of about $15,000 in lifetime earnings***[6] … I mean, life is difficult for anybody, right? But when you start to shave away children's abilities to cope, to find ways around things, to problem-solve, ***you're making it that much harder for them to succeed***." (*Id.,* Exhibit A, pp. 512 (emphasis added); p. 524 (emphasis added).)

- During the cross-examination of defense expert Dr. David Schretlen, Plaintiffs' counsel asked, "if you don't have very good reading comprehension, ***you probably can't go into a job that requires reading, right***?" To which he responded, "[y]eah. Might not go into law." Later she underscored how lack of reading comprehension and "the inability to retrieve words from your brain" foreclose "choices" and "impairs your opportunities in life." Finally, she asked: "You will agree that that limits or ***forecloses the opportunities that Glenn has in life to hold down certain jobs? He couldn't do your job probably***, could he? A: Correct." (*Id.,* p. 4299 (emphasis added); pp. 4312, 4314; pp. 4324 (emphasis added).)

---

[6] Notably, Dr. Lanphear's "income lost per IQ point" number is in each of Dr. Panizich's reports. (Dkt. 764-1, p. 25; 764-2, p. 17; 764-3, p. 27; 764-4, p. 20.) Plaintiffs do not challenge the accuracy of that calculation.

- If there were any doubt, this is what the plaintiffs' counsel said during closing: "… what has happened here is lead is a weight on their shoulders pulling them back. It makes it harder. It makes everything that happens in life harder. It makes it harder to read. It makes it harder to learn. ***It makes it harder to get ahead. It makes it harder to get certain kinds of jobs and certain kinds of jobs just aren't available*** … But there are obstacles that are thrown in their way ***that make certain kinds of jobs extraordinarily difficult to hold. Jobs that require reading. Jobs that talk about the emails, the countless emails we get at your jobs.*** The manuals and all those things. And [Dr. Schretlen] had to admit to me that, yes, ***that would be a difficult type of job requirement with their reading, comprehension scores that each of these young men have. Dr. Schretlen said that, very unfortunately, with the cognitive scores they have that they're probably not going to do his job if they ever wanted to.*** And that is a choice that has been foreclosed for them. It's not about opportunities, it's about the freedom to choose. And they have lost the freedom to make some of the choices that they may have wanted to make in life." (*Id.,* p. 6554 (emphasis added); p. 6822 (emphasis added).)

The notion that lost IQ points results in fewer "opportunities and choices" for Plaintiffs, matters in these cases because, to paraphrase the plaintiffs' closing in *Burton,* it makes it harder to learn, harder to get ahead, harder to get certain jobs and impossible to get others, and, ultimately, harder to succeed. Thus, Dr. Panizich's opinions regarding vocational potential and earning capacity are directly relevant to whether, in fact, "opportunities and choices" are foreclosed for Plaintiffs due to lead exposure. The jury should determine whether the account espoused by Plaintiffs' counsel is applicable to these Plaintiffs, or whether it is not, as Dr. Panizich concludes.

### III. DR. PANIZICH'S OPINIONS ARE NOT A "BACKDOOR" EFFORT TO INTRODUCE UNDULY PREJUDICIAL EVIDENCE OR TESTIMONY.

Emboldened by what they view as favorable rulings in the *Burton* case, Plaintiffs have mischaracterized Dr. Panizich's opinions and anticipated testimony in order to fit them into what they believe are the Court's concerns about Defendants trying "to show that these kids are screw-ups in some way or another." (Dkt. 763, p. 5.) However, as stated in the Introduction to this paper, Dr. Panizich does not describe Plaintiffs as anything close to "screw-ups."

***Nowhere*** in her reports does she equate their "racial backgrounds," "racial ethnicity" or "minority" status to vocational and earnings potential, as Plaintiffs argue. (*See id.,* pp. 1, 6.) ***Nowhere***

in her reports does she contend "bad family history," "bad behaviors" or "unrelated medical conditions" somehow limit their capacity for vocational success, as Plaintiffs again falsely argue. (*See id.,* pp. 4, 6.) To the extent there is information in Dr. Panizich's reports that Plaintiffs will try to fit into such a narrative, its source was the records reviewed, the depositions taken, and, in many cases, what Plaintiffs said during their vocational interviews. Her conclusions, however, come from her synthesis of the data required by the PEEDS-RAPEL method; not "prejudicial," "backdoor" information designed to "convince the jury that these children … were never going to amount to much anyway." (*Id.,* pp. 1, 5, 6.) As Dr. Panizich's reports conclude, she believes they are capable individuals who can have productive lives.

Under PEEDS-RAPEL's five-domain analysis, family work histories, family patterns of educational attainment, and the evaluee's developmental/environmental experiences are part of the information analyzed. (*See generally e.g.,* Dkt. 764-9 (2005 Neulicht and Behrens article) pp. 5-6.)[7] The reason is due to the "unusual questions" posed in cases like these at bar and in *Burton.* As Plaintiffs' counsel stated in their brief explaining why Mr. Riley should testify in *Burton*:

> Any expert providing an opinion of loss of earning capacity faces the task of attempting to assess an individual's potential earning capacity prior to an injury and contrasting it to the individual's future lost earning capacity after an injury. This task is further complicated when the injury occurs at a very young age and when the earning capacity is rendered prior to adulthood.

(*Burton* Dkt. 803, p. 1; *see also* Dkt. 763, p. 8 ("The difficulty with children injured in infancy is determining what their functional ability would have been had they not suffered an insult.").)[8] As

---

[7] Just as the foundational concepts of the PEEDS-RAPEL method date back to the 1950s, so too does the use of parental/family occupational and educational history information to predict future vocational functioning. (*See* Panizich Dec., ¶¶3-11, 13-14.)

[8] For obvious reasons, this challenge is not limited to expert opinions in the field of vocational rehabilitation. Indeed, Plaintiffs' and Defendants' experts on IQ and brain damage face similar issues when attempting to prove that any injury was due to exposure to lead. However, unlike Dr. Panizich, Drs. Trope and Besunder

argued above, the PEEDS-RAPEL method is a well-accepted approach used in the field of vocational rehabilitation to provide answers to these "unusual questions." Dr. Panizich must be allowed to offer evidence of parental/family occupations, educational attainment, developmental environment and the like to adhere to the tenets of the analytical framework used to generate her opinions.

That said, Defendants are cognizant of the Court's previously articulated concerns in *Burton* over the use of certain evidence it perceived to be unfairly prejudicial. To the extent concerns arise over the use of such evidence, it should be dealt with at trial on a case-by-case basis. The wholesale exclusion of all evidence relating to "the histories of the children, their parents, their siblings, and their families" – as suggested by Plaintiffs – would unquestionably be error. (Dkt. 763, p. 2.)

## IV. DR. PANIZICH IS QUALIFIED TO OPINE THAT PLAINTIFFS' DO NOT HAVE VOCATIONAL OR EARNING CAPACITY LOSS DUE TO LEAD EXPOSURE.

Again, the irony of Plaintiffs' argument should not be lost on the Court. In *Burton,* Mr. Riley, who, it bears repeating, is another vocational rehabilitation expert and who, like Dr. Panizich, did not purport to be an expert in lead poisoning, offered these opinions regarding Glenn Burton:

> Given the best case scenario, Glenn Burton, Jr. will sustain a minimum of $10,000 per year loss of earning capacity **as a result of exposure to lead poisoning.** (*Burton* Dkt. 546-1 p. 7 (emphasis added).)

> All of my professional opinions are rendered to a reasonable degree of vocational probability. The anticipated loss of earning capacity for Glenn Burton **is a direct result of exposure to lead poisoning.** (*Burton* Dkt. 546-2, p. 6 (emphasis added).)[9]

---

did not use any accepted methodology to arrive at their opinions, and Dr. Trope disregarded the methodology of the very authority in neuropsychology that she cited. *See generally* Defendants' motions to exclude Drs. Besunder and Trope.

[9] Mr. Riley used similar language in his reports regarding Ravon Owens and Cesar Sifuentes. (*Owens* Dkt. 479-1, p. 7 ("… a $25,000 per year loss of earning capacity **as a direct result of the effects of severe lead poisoning**"); Dkt. 479-2, p. 6 ("…a loss of $25,000 to $30,000 per year. **This is as a direct result of the effects of lead poisoning.**"); *Sifuentes* Dkt. 404-1, p. 6 ("**But for his lead exposure,** Cesar Sifuentes would have been readily employable at entry level positions in the general labor market …"); Dkt. 404-2, p. 6 ("… he will sustain a loss of earning capacity of nearly $30,000 per year through his adult years. **This is as a result of his lead exposure**.") (emphasis added).

There is no logic that would allow Mr. Riley to link vocational and wage loss to childhood lead exposure, but not allow Dr. Panizich to conclude otherwise.

Plaintiffs are correct in stating that Dr. Panizich is not an expert in lead. She cannot (and will not) opine on its purported toxicity, its alleged neurological impact on the brain, or whether certain sequelae are or are not causally connected to lead exposure. But like Mr. Riley, she does not need to have this expertise to render opinions regarding the impact of lead on Plaintiffs' vocational and earnings capacity.

As noted in her reports, the tangible impact Plaintiffs claim as a result of their lead exposure and the "brain damage" it allegedly caused is a loss of IQ points. The influence of IQ on occupational achievement and earnings capacity is a subject that is clearly within the expertise of vocational rehabilitation professionals like Mr. Riley and Dr. Panizich. Dr. Panizich does not offer opinions on causation. Rather, she addresses the question of whether Plaintiffs' claimed loss of IQ points due to lead exposure resulted in any type of vocational disability. Because her assessment of Plaintiffs current functioning is consistent with what would be expected using the PEEDS-RAPEL approach, she is able to conclude that Plaintiffs do not have any vocational disability or limitations due to their lead exposure. This is an opinion the jury should be allowed to consider at the time of trial.

## **CONCLUSION**

For all of the forgoing reasons, the Court should deny Plaintiffs' motion to exclude Dr. Panizich's opinions and testimony in its entirety.

-10-
Case 2:11-cv-00055-LA    Filed 06/22/20    Page 11 of 14    Document 855

Dated at Milwaukee, Wisconsin this 22nd day of June, 2020.

          Respectfully submitted,

    By: */s/ Paul E. Benson*
Joy C. Fuhr, Esq.
Christian E. Henneke, Esq.
Eric S. Fleming
Sylvia Macon Kastens
MCGUIREWOODS, LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1000
Fax: (804) 698-2056
jfuhr@mcguirewoods.com
chenneke@mcguirewoods.com
skastens@mcguirewoods.com

Paul E. Benson, Esq.
MICHAEL BEST & FRIEDRICH LLP
790 N. Water St. #2500
Milwaukee WI 53202
Telephone: (414) 271-6560
Fax: (414) 277-0656
pebenson@michaelbest.com

***Attorneys for Defendant***
***E.I. DuPont de Nemours***

    By: */s/ Charles H. Moellenberg, Jr.*
Charles H. Moellenberg, Jr.
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 391-3939
Fax: (412) 394-7959
Email: chmoellenberg@jonesday.com

Jennifer B. Flannery, Esq.
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, GA 30309-3053
Telephone: (404) 521-3939
Fax: (404) 581-8330
Email: jbflannery@jonesday.com

José A. Isasi, II, Esq.
JONES DAY
77 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 782-3939
Fax: (312) 782-8585
Email: jisasi@jonesday.com

Tracy Stratford, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Telephone: (216) 586-3939
Fax: (216) 579-0212
Email: tkstratford@jonesday.com

Jeffrey K. Spoerk, Esq. (1005405)
Andrew T. Stoker, Esq. (1104067)
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
Telephone: (414) 277-5000
Fax: (414) 271-3552
Email: jeff.spoerk@quarles.com
Email: andrew.stoker@quarles.com

***Attorneys for Defendant
The Sherwin-Williams Company***

By: */s/ Timothy A. Bascom*
Timothy A. Bascom, Esq.
BASCOM, BUDISH & CEMAN, S.C.
2600 North Mayfair Road, Suite 1140
Wauwatosa, WI 53226
Tel: (414) 774-8835
Fax: (414) 476-8545
tbascom@bbclaw.com

Robert P. Alpert, Esq.
MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326
Tel: (404) 233-7000
Fax: (404) 365-9532
rpa@mmmlaw.com

*Attorneys for Defendant*
*Armstrong Containers, Inc.*

By: */s/ Daniel T. Flaherty*
 Daniel T. Flaherty
 Anthony S. Baish
 GODFREY & KAHN, S.C.
 833 East Michigan Street, Suite 1800
 Milwaukee, WI 53202-5615
 Telephone: (414) 273-3500
 dflaherty@gklaw.com
 abaish@gklaw.com

 Bruce R. Kelly
 William H. Voth
 ARNOLD & PORTER KAYE SCHOLER LLP
 250 West 55th Street
 New York, NY 10019-9710
 Telephone: (212) 836-8000
 bruce.kelly@arnoldporter.com
 william.voth@arnoldporter.com

 Jonathan L. Stern
 ARNOLD & PORTER KAYE SCHOLER LLP
 601 Massachusetts Ave, NW
 Washington, D.C. 20001
 Telephone: (202) 942-5000
 jonathan.stern@arnoldporter.com

 Sean Morris
 ARNOLD & PORTER KAYE SCHOLER LLP
 777 South Figueroa Street
 Los Angeles, CA 90017
 Telephone: (213) 243-4199
 sean.morris@arnoldporter.com

 *Attorneys for Defendant*
 *Atlantic Richfield Company*